**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| IRENE ASTUDILLO, <br><br> *Plaintiff*, <br><br> v. <br><br> SALON MACOMB, LLC, *et al.*, <br><br> *Defendants*. | Civil Action No. 24 - 2294 (SLS) <br> Judge Sparkle L. Sooknanan |

## <u>MEMORANDUM OPINION</u>

Irene Astudillo worked as a shampoo assistant for several years at Salon Macomb, LLC, a boutique hair salon in the District of Columbia. Ms. Astudillo resigned in late 2023 and brought this lawsuit about a year later to recover unpaid wages and overtime compensation. She sued Salon Macomb and one of its co-owners, Murat Akdemir, alleging violations of the Fair Labor Standards Act (FLSA), the D.C. Minimum Wage Act Revision Act of 1992 (DCMWA), and the D.C. Wage Payment and Collection Law (DCWPCL). The Parties have cross-moved for partial summary judgment on Ms. Astudillo's FLSA claim. They dispute (1) whether Salon Macomb's annual gross sales exceeded $500,000 for the relevant period, subjecting it to the FLSA's enterprise coverage, 29 U.S.C. § 203(s)(1)(A)(ii); and (2) whether Ms. Astudillo is entitled to individual coverage under the FLSA for engaging in commerce, 29 U.S.C. §§ 206, 207, by occasionally picking up supplies for Salon Macomb at stores in Maryland.

The Court is not impressed by the strength of Ms. Astudillo's claim. She has not established that Salon Macomb is an FLSA-covered enterprise based on its gross sales, which fall short of the $500,000 statutory minimum. And her evidence supporting individual coverage is strongly contested—indeed, the Defendants present evidence that Ms. Astudillo's supply trips were limited

and not part of her employment duties. Still, the Defendants' success on that point hinges on assessing the credibility of witnesses who tell very different stories. That is a task for a jury, not for the Court at summary judgment. Accordingly, the Court grants the Defendants' motion for summary judgment as to Salon Macomb's FLSA enterprise coverage but denies both Parties' motions as to Ms. Astudillo's individual FLSA coverage.

## BACKGROUND

### A.    Statutory Background

Congress enacted the FLSA to correct and eliminate conditions "detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). The Act was intended to achieve these goals as rapidly as possible "without substantially curtailing employment or earning power." *Id.* § 202(b). "Section 206 sets the guidelines for establishing the minimum wage an employee must be paid, and Section 207 requires overtime payment at one and one-half the regular rate for any additional hours over 40 worked in a single week." *Morales v. Humphrey* (*Morales I*), 309 F.R.D. 44, 47 (D.D.C. 2015) (citing 29 U.S.C. §§ 206, 207).

Notably, the FLSA's overtime provisions do not apply to all employers or to all employees. *See Morales v. Humphrey* (*Morales II*), 187 F. Supp. 3d 163, 167 (D.D.C. 2016); *Benton v. Laborers' Joint Training Fund*, 210 F. Supp. 3d 99, 105–06 (D.D.C. 2016). The Act covers those employed by an "enterprise engaged in commerce or in the production of goods for commerce," also known as enterprise coverage. 29 U.S.C. § 207(a)(1); *Benton*, 210 F. Supp. 3d at 106. And the Act also covers employees who are "in any workweek . . . engaged in commerce or in the production of goods for commerce," which is called individual coverage. 29 U.S.C. § 207(a)(1); *Benton*, 210 F. Supp. 3d at 106.

2

## B.    Factual Background

The Court draws the facts from the Parties' Statements of Material Facts and the underlying materials referenced in those statements. *See* Defs.' Statement of Material Facts (DSOF), ECF No. 36-1; Pl.'s Statement of Material Facts & Response to DSOF (PSOF), ECF No. 37-2; Defs.' Resp. to PSOF, ECF No. 43-1; Pl.'s Reply Statement of Facts (Pl.'s Reply SOF), ECF No. 46-1. The Court assumes the facts in those statements to be true unless they have been specifically disputed. *See* Fed. R. Civ. P. 56(e)(2); *see also* LCvR 7(h)(1).[1]

Salon Macomb is a boutique hair salon in the District of Columbia. PSOF ¶¶ 17, 19. Mr. Akdemir and Cem Surucu founded the salon in 2014 and have been equal owners since then. PSOF ¶¶ 18, 20. During the period relevant to this lawsuit, Mr. Surucu served as Salon Macomb's finance manager. PSOF ¶ 21; Defs.' Resp. to PSOF at 44, ¶ 21. Mr. Akdemir was the operations manager and was generally responsible for ordering supplies. Defs.' Response to PSOF at 45–46, ¶ 27; *see* Pl.'s Reply SOF ¶ 27. Salon Macomb purchased hair salon supplies from SalonCentric in Rockville, Maryland, and cleaning supplies and coffee from a Costco store in Wheaton, Maryland. PSOF ¶¶ 23–24. No orders could be placed at either store without approval from either Mr. Akdemir or Mr. Surucu. PSOF ¶ 25.

Ms. Astudillo worked as a shampoo assistant at Salon Macomb from April 2019 through September 2023.[2] *See* DSOF ¶¶ 4, 13. During her time at Salon Macomb, Ms. Astudillo travelled to SalonCentric at least once or twice to pick up hair supplies. Akdemir Dep. 51:3–52:11,

---

[1] Local Rule 7(h) provides that "the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1).

[2] The Parties dispute whether Ms. Astudillo was properly classified as an independent contractor from March 2023 until September 2023, but they agree that that dispute is not material to the resolution of their summary judgment motions. *See* Defs.' Mem. Supp. Mot. Partial Summ. J. 4 n.3, ECF No. 36-6; Pl.'s Reply SOF ¶ 4, ECF No. 46-1.

ECF No. 36-2. She also purchased supplies for Salon Macomb at Costco at least six times during a six-month period between November 2022 and April 2023. DSOF ¶ 14; PSOF ¶ 14. On each occasion, Salon Macomb reimbursed Ms. Astudillo for the supplies she purchased at Costco. DSOF ¶ 14; PSOF ¶ 14. Ms. Astudillo resigned from the salon in September 2023. DSOF ¶ 15; PSOF ¶ 15.

Salon Macomb's tax returns reflect that its "gross receipts or sales" were: $359,171 in 2021; $442,513 in 2022; and $420,766 in 2023. DSOF ¶ 8; DSOF Ex. 2, ECF No. 36-3. While the salon accepted cash and credit card payments throughout this period, in 2023, it began offering a discount to customers who paid in cash. DSOF ¶ 12; PSOF ¶ 12. The salon advertised the discount with a sign at the reception desk informing customers that they would get "10% OFF ANY SERVICE WITH CASH PAYMENT." DSOF ¶¶ 11–12; PSOF ¶ 12. The salon's 1099-K forms reflect that it received customer credit card payments totaling: $442,512.56 in 2022; and $399,932.50 in 2023. PSOF Ex. 7, ECF No. 37-10.[3]

### C.    Procedural Background

Ms. Astudillo filed this lawsuit against Salon Macomb and Mr. Akdemir on August 5, 2024. ECF No. 1. On June 3, 2025, she filed an Amended Complaint, advancing claims for non-payment of wages and overtime compensation under the FLSA, the DCMWA, and the DCWPCL. Am. Compl. ¶¶ 16–38, ECF No. 33. After discovery on Ms. Astudillo's FLSA claim, the Parties cross-moved for partial summary judgment regarding the applicability of the FLSA. Defs.' Mot. Partial Summ. J., ECF No. 36, Pl.'s Mot. Partial Summ. J., ECF No. 37. On September 26, 2025, the Defendants moved to strike a supplemental declaration that Ms. Astudillo attached to her reply

---

[3] Salon Macomb's 1099-K form for 2021 reflects customer credit card payments totaling $249,11.53, but it does not appear to include transactions from January through June of that year. PSOF Ex. 7.

brief. ECF No. 47. All three motions are fully briefed and ripe for review. *See* Pl.'s Opp'n to Defs.'

Mot., ECF No. 38; Defs.' Reply & Opp'n to Pl.'s Mot., ECF No. 43-2; Pl.'s. Reply, ECF No. 46;

Pl.'s Opp'n to Mot. Strike, ECF No. 48; Defs.' Reply Supp. Mot. Strike, ECF No. 49.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). "The burden is on the movant to make the initial showing of the absence of

any genuine issues of material fact." *Ehrman v. United States*, 429 F. Supp. 2d 61, 66

(D.D.C. 2006). "The evidence of the non-movant is to be believed, and all justifiable inferences

are to be drawn in [its] favor." *Est. of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123

(D.C. Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "A party

asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to

particular parts of materials in the record" or "showing that the materials cited do not establish the

absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

evidence to support the fact." Fed. R. Civ. P. 56(c)(1). When "both parties file cross-motions for

summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman*,

429 F. Supp. 2d at 67.

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to

the jury is as much art as science." *Est. of Parsons.*, 651 F.3d at 123. "Courts must avoid making

credibility determinations or weighing the evidence, since credibility determinations, the weighing

of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not

those of a judge." *Rothberg v. Xerox Corp.*, No. 12-cv-617, 2016 WL 10953882, at *10 (D.D.C.

Feb. 3, 2016) (cleaned up) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

150–51 (2000)). But a court may "evaluate an inadequately supported assertion of material fact

and deem it not materially disputed." *Id.* "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## DISCUSSION

To trigger the protections of the FLSA, Ms. Astudillo bears the burden of establishing that her "employment relationship" with Salon Macomb was "subject to coverage under the FLSA." *Romero v. RBS Constr. Corp.*, No. 18-cv-179, 2022 WL 522989, at \*5 (D.D.C. Feb. 22, 2022). "Coverage can be either: (1) enterprise coverage; or (2) individual coverage." *Id.* (citing *Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 295 n.8 (1985)). The Court concludes as a matter of law that Ms. Astudillo's employment relationship with Salon Macomb was not subject to enterprise coverage, and so the Defendants are entitled to summary judgment on that point. But because there are material facts in dispute as to individual coverage, the Court may not grant summary judgment to either side.

### A.    Enterprise Coverage

"The law regarding 'enterprise' coverage under the FLSA is well settled and relatively straightforward[.]" *Morales II*, 187 F. Supp. 3d at 167. In essence, "the FLSA defines an 'enterprise engaged in commerce or in the production of goods for commerce' as one that 'has employees engaged in commerce' and 'whose annual gross volume of sales made or business done is not less than $500,000.'" *Id.* (quoting 29 U.S.C. § 203(s)(1)(A)(i)–(ii)). The latter part of the inquiry is the one at issue here.[4] Ms. Astudillo contends that she can prove at trial that Salon

---

[4] As to the first part of the inquiry, Section 203(s)(1)(A)(i) specifies that an employer must have "employees engaged in commerce or in the production of goods for commerce, or that has

Macomb's gross income exceeded $500,000 per year during the relevant period. Pl.'s Mem. Supp. Mot. Partial Summ. J. & Opp'n (Pl.'s Mot.) 21–27, ECF No. 37-1. The Defendants insist that she cannot. Defs.' Mem. Supp. Mot. Partial Summ. J. (Defs.' Mot.) 5, ECF No. 36-6. The Defendants have the better of the argument.

Courts look to various factors when calculating the annual gross volume of sales of a business. Tax records, when they exist, often inform the calculation—although their probative value is diminished when they are perceived to be unreliable. *See, e.g.*, *Arilus v. Diemmanuele*, 522 F. App'x 881, 882–84 (11th Cir. 2013) (per curiam) (unpublished) (affirming grant of summary judgment for defendant employers where district court relied on employers' tax returns to find that "their combined annual sales were less than $500,000 during the relevant years"); *Lin v. China Wok Hillsboro, Inc.*, No. 20-cv-3186, 2022 WL 3716587, at *4 (C.D. Ill. Aug. 29, 2022) (looking to a defendant's tax returns but finding them "clearly fraudulent"). Other financial records can be relevant as well. *See Morales II*, 187 F. Supp. 3d at 169 (looking to the defendant's bank statements); *see also* 29 C.F.R. § 779.266 ("The sales records maintained as a result of the accounting procedures used for tax or other business purposes may be utilized in computing the annual dollar volume[.]").

When a defendant's financial records indicate annual gross sales below the FLSA's $500,000 threshold, plaintiffs may call into question "the veracity of those documents." *Jia Hu Qian v. Siew Foong Hui*, No. 11-cv-5584, 2013 WL 3009389, at *3 (S.D.N.Y. June 14, 2013). And they may produce their own evidence of what they believe to be the defendant's actual

---

employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person." 29 U.S.C.A. § 203(s)(1)(A)(i). The Defendants are not seeking summary judgment "based on [that] section of the Act." Defs.' Reply & Opp'n to Pl.'s Mot. 1 n.1.

revenue. *See Morales I*, 309 F.R.D. at 48 ("It would be unfair for Plaintiffs to be cabined by the bank statements alone."). To establish the presence of a genuine dispute, that evidence must be sufficient for a reasonable jury to conclude that annual gross sales have in fact surpassed the $500,000 threshold.

In *Morales v. Humphrey*, for example, the defendant landlord contended that he had never earned more than $442,000 in a given year based on revenue estimates he calculated using his bank statements. 187 F. Supp. 3d at 167. The plaintiffs disputed the landlord's calculations, asserting that he did not properly count every relevant statement entry. *Id.* The court expressed some reservations about both parties' calculations and elected to conduct its own. After "conservative[ly]" including only those deposits that seemed potentially indicative of revenue, the court found that the landlord's revenue tallied over $500,000 in two of the three years in question and approximately $495,000 in the third. *Id.* at 169–70 (emphasis omitted). Thus, the court declined to grant summary judgment in the landlord's favor on the issue of FLSA enterprise coverage. *Id.* In doing so, the court further noted that "a factfinder might find it odd that a business renting 80 units would not earn at least $500,000 per year; after all, if [the landlord] rented each unit for a paltry $521 per month—well below market in the District of Columbia—his business would clear the half-million threshold." *Id.* at 170.

In *Lin v. China Wok Hillsboro*, the court similarly began its analysis with the defendants' financial records. There, the defendant restaurant produced tax returns indicating that it had earned significantly less than $500,000 (and no more than $227,000) in each of the years that the plaintiff had been employed. *Lin*, 2022 WL 3716587, at *4. The court concluded, however, that the tax returns were "clearly fraudulent." *Id.* Among other irregularities, the returns indicated that the restaurant had "paid no wages to any employee" despite the defendants' admission that they had

employed the plaintiff. *Id.* As an alternative to the defendants' unreliable records, the plaintiff submitted an affidavit stating that "while he was a waiter and cook, [the restaurant] served approximately 120 dine-in customers and approximately 45 takeout customers daily, resulting in approximately $1,875.00 in gross daily revenue and at least $585,000 in gross annual revenue." *Id.* The court explained that this testimony would be admissible because it spoke to "the number and cost of the food orders that [the plaintiff] personally took and filled as a waiter and cook." *Id.* at *5. It thus concluded—based in part on the plaintiff's affidavit—that "material issues of fact" regarding the restaurant's revenue precluded summary judgment on the plaintiff's FLSA claim. *Id.* at *5–6.

And finally, in *Jia Hu Qian v. Siew Foong Hui*, a court presented with similar evidence reached the same conclusion. In that case, the defendants claimed that they were not subject to FLSA coverage because their tax returns reported total sales of "less than $500,000 each year for the relevant period" and no more than $223,000 in any one year. *Jia Hu Qian*, 2013 WL 3009389, at *2. But the plaintiff claimed that the returns undercounted cash payments, which he said made up approximately 75 percent of sales. *Id.* at *1. And he supported his argument with an affidavit "cit[ing] his experience as a deliveryman, as well as his familiarity with the business he gained by meeting twice a day with the other employees and the owner." *Id.* at *1. He stated that "credit card tips" were distributed at those daily meetings, which enabled him to know "the value of those tips." *Id.* He "was also aware of the value of tips that he earned each day in cash." *Id.* The court noted that the plaintiff "was in a position to obtain specific knowledge about the restaurant's sales, including the proportion of sales paid with cash and those paid by a credit card." *Id.* at *3. And if a jury credited his testimony, it could find that the defendants' gross sales exceeded $600,000 a

year—well above the FLSA threshold. *Id.* at \*3–4. The plaintiff had thus raised a "question of material fact suitable for a jury trial." *Id.* at \*3.

Here, the Parties' arguments follow a similar pattern to the cases discussed above. The Defendants point to tax returns showing less than $500,000 in sales, and Ms. Astudillo contends that Salon Macomb's revenue may have actually surpassed that threshold because the tax returns' "gross receipts or sales" appear to underreport cash sales. Pl.'s Mot. 25–27. In support, Ms. Astudillo asserts: (1) that Mr. Akdemir told customers that the salon's cash discount was "to avoid paying tax on cash sales"; (2) that the Defendants' claimed amount of cash sales is "not credible" based on a comparison of the salon's tax returns and its 1099-Ks; and (3) that the gross receipts reported in the tax returns are "close enough" to $500,000 that "even a modest amount of unreported cash sales" would push the salon over the coverage threshold. *Id.* But these arguments do not provide an evidentiary basis for concluding that Salon Macomb conducted tens of thousands of dollars' worth of unreported cash sales sufficient to trigger FLSA enterprise coverage.

*First*, the existence of the cash discount, which the Defendants do not contest, says nothing about the volume of cash sales. Even if a jury credited the relevant testimony that Mr. Akdemir solicited cash payments to more easily avoid taxes, there is no evidence about how many customers actually paid for services in cash. *See* Astudillo Decl., ECF No. 37-5; Jowkar Decl., ECF No. 37-6. And there is some evidence suggesting that the discount did not result in more customers paying in cash. *See* Akdemir Dep. 126:12–127:1 (discussing how the cash discount was offered to avoid credit card fees but did not end up increasing the number of clients paying in cash). Thus, the discount on its own offers no basis to infer that cash sales were frequent or underreported.

*Second*, Ms. Astudillo is right that there is essentially no difference between the gross receipts reported in Salon Macomb's 2022 tax return ($442,513.00) and the amount of credit card

transactions reported on its 1099-K for that year ($442,512.56), raising questions about the reliability of the salon's financial documents. It seems highly improbable that all the salon's sales in 2022 were made by credit card. But this irregularity, without more, does not support that $58,000 worth of cash sales went unreported in 2022.

Ms. Astudillo says otherwise, pointing out that the Defendants' gross receipts and Form 1099-K filed with the IRS for 2023 suggest that the salon conducted more than $20,000 worth of cash sales in a single month in March 2023. Pl.'s Mot. at 26; PSOF Ex. 5 at 6, ECF No. 37-8; PSOF Ex. 7 at 000003. But Ms. Astudillo's focus on that month is the definition of a cherry-pick. A careful review of all the salon's 2023 monthly gross receipts and its 1099-K reveals that outside of March, the salon never made more than $3,500 in monthly cash sales, and in many months it made much less than that. PSOF Ex. 5 at 4–15; PSOF Ex. 7 at 4. In that context, the $20,000 in cash sales in March 2023 looks like an extreme anomaly, not a number that a jury could reasonably extrapolate across multiple months in 2022, even assuming cash sales in those months were underreported.

At bottom, while the Defendants' financial records are not airtight, none of the irregularities suggest that the records are inherently unreliable. They are not "clearly fraudulent" like the records in *Lin*, 2022 WL 3716587, at *4, nor do they defy common sense like the rental income calculations in *Morales II*, 187 F. Supp. 3d at 170. Most importantly, Ms. Astudillo has presented no evidence as an alternative to the records to support a jury determination that Salon Macomb's gross sales surpassed the $500,000 threshold. Recall that the plaintiffs in *Lin* and *Jia Hu Qian* offered firsthand evidence of gross annual revenue informed by their work in positions that gave them direct insight into the volume of their employers' sales. *Lin*, 2022 WL 3716587, at *4–5; *Jia Hu Qian*, 2013 WL 3009389, at *1-4. Ms. Astudillo and her witnesses have provided

11

no comparable evidence here. Indeed, there is no evidence that Ms. Astudillo had access to that information in her position as a shampoo assistant. Without such evidence, Ms. Astudillo falls short of showing that there is a "genuine dispute" about Salon Macomb's coverage under the FLSA. *See* Fed. R. Civ. P. 56(a)(1); *see also Josendis v. Wall to Wall Residence Repairs, Inc*, 662 F.3d 1292, 1317 (11th Cir. 2011) (affirming district court's finding that plaintiff had not created a "genuine issue of material fact" when he "failed to provide concrete evidence that [the defendant] had gross sales of at least $500,000 in any one year" and instead "principally relied on conjecture and speculation, not admissible evidence based on personal knowledge").

*Third*, and finally, Ms. Astudillo's reliance on the "rolling quarters" method of calculating gross annual sales to push Salon Macomb closer to the FLSA coverage threshold is unavailing. Pl.'s Mot. 26–27. Some courts have used the so-called "rolling quarters" method to find enterprise coverage at the start of any quarter where the employer's "annual dollar volume based on the sum of the four preceding quarters" exceeds the statutory threshold. *See, e.g.*, *Burnley v. Short*, 730 F.2d 136, 138 (4th Cir. 1984) (citing 29 C.F.R. § 779.266(b)). Using this method, Ms. Astudillo suggests that Salon Macomb was even closer to the $500,000 threshold at the start of July 2022, when it had conducted more than $470,000 in gross sales over the preceding twelve months. Pl.'s Mot. 27. But even assuming Ms. Astudillo has applied the method correctly, which the Defendants contest, *see* Defs.' Reply & Opp'n to Pl.'s Mot. 23–24, there is still a $30,000 gap that she cannot close. As already discussed, she simply has not produced evidence on which a jury could reasonably conclude that Salon Macomb made tens of thousands of dollars' worth of unreported cash sales. For all these reasons, the Court grants summary judgment for the Defendants as to Salon Macomb's FLSA enterprise coverage.

### B.     Individual Coverage

Turning to individual coverage, an employee must show that she personally "engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 207(a)(1). On this point, the Parties tell very different stories through sworn testimony and declarations. Ms. Astudillo maintains that she engaged in commerce because she regularly travelled across state lines to purchase or pick up supplies for Salon Macomb. Pl.'s Mot. 12–20. The Defendants strenuously disagree. They assert (1) that Ms. Astudillo volunteered to pick up supplies when it was convenient for her (not because it was part of her job duties), (2) that they told her to stop making such trips when they discovered that she was putting them on her time sheet, and (3) that the limited number of trips that she made does not qualify her for FLSA coverage. Defs.' Mot. 16–20; DSOF ¶ 14. While the Court finds the Defendants' version of events more compelling, there is sufficient evidence to support a jury reaching the opposite conclusion if it believes the testimony of Ms. Astudillo and her witnesses over that of Mr. Akdemir. Summary judgment is thus inappropriate.

"The FLSA's implementing regulations explain that travel across state lines can, in some circumstances, establish individual FLSA coverage." *Benton*, 210 F. Supp. 3d at 106–07 (citing 29 C.F.R. § 776.12). Jobs that typically involve regular interstate travel include "traveling service men, traveling buyers, traveling construction crews, collectors, and employees of such organizations as circuses, carnivals, road shows, and orchestras." 29 C.F.R. § 776.12. But coverage is not limited to those types of jobs. Any employees who regularly travel "across State lines in the performance of their duties (as distinguished from merely going to and from their homes or lodgings in commuting to a work place) are engaged in commerce and covered by the Act." *Id.* Employees are not covered, however, if their job takes them across state lines in only "isolated or

13

sporadic instances" and is "otherwise intrastate in character." *Id.* "Doubtful questions arising in the area between the two extremes must be resolved on the basis of the facts in each individual case." *Id.*

There is not an abundance of case law examining "how frequently an individual must travel across state lines in order to establish individual coverage." *See Benton*, 210 F. Supp. 3d at 107. But in *Benton v. Laborers' Joint Training Fund*, a court in this District analyzed the relevant case law to provide guideposts for the analysis. *Id.* The court found at one of end of the spectrum that "weekly or bi-weekly[5] travel is almost certainly sufficient to establish individual coverage." *Id.* (citing *Bowrin v. Cath. Guardian Soc'y*, 417 F. Supp. 2d 449, 468–71 (S.D.N.Y. 2006)). At the other end, employees who travelled out of state only once or twice per year were generally not covered. *Id.* (citing *Isaacson v. Penn Cmty. Servs., Inc.*, Nos. 69-cv-878, 69-cv-879, 1970 WL 794, at *4 (D.S.C. Oct. 19, 1970)). And in the middle, as especially pertinent here, individuals who travelled "bi-monthly"—as in no more than once every two months—"approache[d] the limits of coverage." *Id.* In *Benton*, the court concluded that the exact "frequency of travel is critical to establishing coverage" and that Ms. Benton's travel rate was sufficiently disputed to preclude summary judgment. *Id.* at 110. More specifically, the court found that if Ms. Benton convinced a jury to credit her evidence that she completed "[n]ineteen instances of interstate travel over a nineteen month period (averaging one instance of travel per month)," that "would be sufficient to show that [she] . . . was covered by the FLSA." *Id.* at 109.

---

[5] By "bi-weekly" this Court understands the *Benton* court to have meant travel every other week. *See Romero v. RBS Constr. Corp.,* No. 18-cv-179, 2022 WL 522989, at *16 (D.D.C. Feb. 22, 2022) (understanding the *Benton* court's use of "bi-weekly and bi-monthly . . . to mean once every two weeks and once every two months respectively").

In *Romero v. RBS Construction Corp.*, another court in this district applied *Benton*'s framework to determine that a plaintiff who had "made six trips over seven months" was "entitled to FLSA coverage." 2022 WL 522989, at *16. In doing so, the court noted that its conclusion was consistent with *Benton*'s guidance that "bi-monthly travel is approaching *the limits* of coverage, but that it does not exceed them." *Id.* (citing *Benton*, 210 F. Supp. 3d at 107). And it noted that one of the cases *Benton* relied on had found that fifteen trips over thirty-six months would be "a close[] call." *Id.* (quoting *Solano v. A Navas Party Prod., Inc.*, 728 F. Supp. 2d 1334, 1346 (S.D. Fla. 2010)).

Along with determining the frequency of an employee's interstate travel, the *Benton* court and others have emphasized that an additional "salient question" that must be answered is whether an employee's travel was "*in the performance of* [her] duties." *Benton*, 210 F. Supp. 3d at 110 (alteration in original) (quoting 29 C.F.R. § 776.12). In *Martinez Matute v. CNN Construction, Inc.*, for example, a court in this District found that a plaintiff's complaint was "insufficient to invoke coverage under the FLSA" because it did "not allege any facts" showing that the plaintiff "travelled across state line *in the performance of his duties*" as opposed to travelling as part of his commute. 415 F. Supp. 3d 226, 234 (D.D.C. 2019) (emphasis added)); *see also Bowrin*, 417 F. Supp. 2d at 468 (finding that "plaintiffs' transport of residents out of state for shopping and recreational excursions occur[red] within the scope of performing their duties").

Here, both the frequency of Ms. Astudillo's travel and whether that travel was within the scope of her duties is hotly contested. The Parties agree that Ms. Astudillo picked up supplies from Costco at least six times over a six-month period and from SalonCentric at least once or twice during the course of her employment. DSOF ¶ 14; PSOF ¶ 14; Akdemir Dep. 51:3–52:11. But that is where their agreement ends.

15

The Defendants assert that any trips to SalonCentric or Costco were not within the scope of Ms. Astudillo's duties as a shampoo assistant. At his deposition, Mr. Akdemir testified that Ms. Astudillo volunteered to go to SalonCentric and Costco, that he never directed her to do so, and that he explicitly told her that she did not need to make such trips after he discovered that she was logging her shopping time on her timesheets. Akdemir Dep. 62:7–21, 77:4–15, 96:1–20, 227:6–20, 233:1–237:19, 243:3–9. According to Mr. Akdemir, Ms. Astudillo's travel to Maryland was entirely of her own initiative. *Id.* He testified, for example, that Ms. Astudillo told him that she was going to Costco to get things for herself and asked if there was anything she could get for him while she was there. *Id.* at 236:15–21. A jury that credits Mr. Akdemir's testimony could reasonably conclude that Ms. Astudillo completed *no* interstate travel in the performance of her duties and thus was not covered by the FLSA. This, in and of itself, is enough to preclude summary judgment in Ms. Astudillo's favor.

Ms. Astudillo has a different account. She submitted a sworn declaration stating that between January 2021 and September 2023, Mr. Akdemir and Mr. Surucu asked her to pick up supplies at Costco "roughly twice a month" and at SalonCentric "roughly once or twice a month." Astudillo Decl. ¶¶ 3, 6. She does not recall Mr. Akdemir "ever telling [her] to stop travelling to Costco to purchase supplies for Salon Macomb," and she says that Mr. Akdemir and Mr. Surucu "acted hostilely towards [her]" when supplies she "picked up/purchased from SalonCentric and Costco were running low." *Id.* ¶¶ 9–10. Ms. Astudillo also submitted declarations from two former co-workers that broadly corroborate her account. Both co-workers say that Ms. Astudillo made supply trips to Costco and/or SalonCentric at the direction of Mr. Akdemir and Mr. Surucu on at least a monthly basis. Jowkar Decl. ¶¶ 2–3; Castro Decl. ¶¶ 4–8, ECF No. 37-7. A jury that credits this testimony could reasonably find that Ms. Astudillo's Maryland supply trips were part of her

16

duties and that she was at least covered by the FLSA during the six-month period when she made six trips to Costco. *See Benton* 210 F. Supp. 3d at 109 (finding that travel "averaging one instance . . . per month[] would be sufficient" to establish FLSA coverage). It might also conclude, if it credits her testimony about the supply trips that the Defendants do not acknowledge, that her coverage extended over a longer period. Given this possibility, the Court cannot enter summary judgment for the Defendants on this issue.

At bottom, Ms. Astudillo's ability to establish coverage under the FLSA will depend on which version of events is closer to the truth. Making that determination requires assessing witness credibility, weighing the evidence, and "drawing [] legitimate inferences" therefrom. *Reeves*, 530 U.S. at 150–51 (quoting *Anderson*, 477 U.S. at 255). Those are tasks that must be left to the jury. *Id.*

## CONCLUSION

For the above reasons, the Court denies Ms. Astudillo's Motion for Partial Summary Judgment, ECF No. 37, and grants in part and denies in part the Defendants' Motion for Partial Summary Judgment, ECF No. 36.[6]

A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:    March 5, 2026

---

[6] Because the supplemental declaration that Ms. Astudillo attached to her reply does not factor into the Court's reasoning, the Court does not consider it and denies the Defendants' motion to strike it, *see* ECF No. 47, as moot.